IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CATHERINE MARCUCCI, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 08-5560 |
| | : | |
| H & L DEVELOPERS, INC., et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                 **December 31, 2009**

Plaintiff Catherine Marcucci asks the Court to order repayment of a $1.2 million loan, plus interest, from Defendants Ronald and Patricia Laessig, as guarantors of the loan. Marcucci's claim for a monetary award is supported by three promissory notes and the Laessigs' written guaranty to repay the promissory notes if the original lender, H & L Developers, Inc., defaulted. The Laessigs argue Marcucci's claim fails because the statute of limitations has expired and the promissory notes and guaranty are not supported by consideration. Because the Court concludes this action is within the applicable statute of limitations and the guaranty agreement is binding upon Ronald and Patricia Laessig, judgment will be entered in favor of Marcucci.[1]

## FINDINGS OF FACT

1.      Ronald and Patricia Laessig met Catherine Marcucci and her late husband Dr. Paul J. Marcucci in the 1980s. The two families became friends and the Laessigs were frequently invited to family functions and social gatherings with the Marcuccis.

2.      In 1986, Ronald Laessig (Laessig) presented a real estate investment opportunity with his

---

[1] Marcucci has also requested attorneys' fees. I will determine the appropriateness and amount of attorneys' fees at a later proceeding.

company, H & L Developers, Inc. (H & L), to the Marcuccis.

3.      H & L was a Florida real estate development corporation created to build single-family homes in Florida. Laessig held 50 percent of H & L's shares as one of the company's two shareholders.

4.      In 1990, Paul Marcucci passed away. Following his death, Catherine Marcucci worried about her future financial stability. Laessig told Catherine Marcucci he could help her.

5.      Laessig told Marcucci to sell real estate properties she owned and to lend the funds from the sale of the real estate to him for investment purposes. Laessig promised Marcucci if she lent him $1.2 million, he would invest the money for her and pay her back with interest.

6.      Marcucci agreed to lend Laessig the money, believing the interest payments would sustain her financially for the rest of her life. She lent $1,200,000 to Laessig on the condition he invest it for her and remit regular payments on the loan. Marcucci expected interest payments monthly.

7.      Laessig invested Marcucci's money in an H & L real estate venture in Florida. By January 6, 1989, Marcucci had lent Laessig $772,090.39. Laessig directed his attorney to prepare a promissory note in this amount. On January 6, 1989, Laessig sent Marcucci a promissory note which stated Ronald and Patricia Laessig had borrowed $772,090.39 and that they were legally obligated to repay the principal, plus interest, to Catherine Marcucci by June 30, 1990. Both Ronald and Patricia Laessig signed this note. No interest or principal was ever paid on this note. The principal amount of this loan was rolled over into Marcucci's total loan of $1,200,000.

8.      By June 1990, Marcucci had lent Laessig a total of $1,200,000. After receiving this loan,

2

Laessig directed his attorney to create three additional promissory notes to memorialize the $1,200,000 loan. Laessig instructed his attorney as to the amount of the loan Laessig received, to whom the loan was payable, the interest rate, the due date, and the events which would constitute default on the loan. He also directed his attorney to prepare a personal guaranty for this loan and chose the terms of the guaranty, including the events of default.[2]

9.      On June 30, 1990, the Laessigs both signed a "Guaranty (Suretyship) Agreement" (Laessig Guaranty), which they sent to Catherine Marcucci.

10.     The Laessig Guaranty states the agreement is between Ronald and Patricia Laessig, as guarantors, and P. John Marcucci, Jr., Paula Schwartz and Richard Marcucci, "Trustees Under Deed of Trust of P. John Marcucci dated September 22, 1988."

11.     P. John Marcucci, Jr., Paula Schwartz, and Richard Marcucci are Catherine Marcucci's three

---

[2] Laessig offered equivocating testimony about the origination of this guaranty. After Laessig was directed to look at the guaranty, the following exchange occurred:

> Plaintiff's Counsel (PC): Are you familiar with this document?
> Ronald Laessig (RL): Yes I am.
> PC: And who prepared this document?
> RL: That would be the same attorney at Fox Rothschild.
> PC: You don't recall the attorney's name?
> RL: No I don't.
> PC: And whose idea was it to have this document prepared?
> RL: I really don't recall.
> PC: Did you go to the attorney and say I'd like to give a personal guaranty for the 1.2 million dollars?
> RL: That could have happened, yes.
> PC: The attorney would not have originated the idea on himself or herself, would they?
> RL: No.
> PC: And the purpose was to protect Mrs. Marcucci, correct?
> RL: That's correct.

Laessig Trial Testimony, Aug. 28, 2009.

children.  Neither Catherine nor any of her three children are aware of any "Deed of Trust"

created in their names.  Laessig testified he instructed his attorney to make out the note to

this "Deed of Trust" as part of some estate planning, but Laessig said the deed of trust was

prepared by someone else.  Laessig testified the deed of trust was prepared for Catherine

Marcucci; she is the intended beneficiary and he believes her children serve as trustees.

12.     The Guaranty states the lender agreed to make a $1.2 million loan to H & L "pursuant to the

        terms of, and evidenced by, that certain Promissory Note (the Note)."  Laessig Guaranty §

        A.  The Guaranty stated that, as a fifty percent shareholder, Ronald Laessig had a significant

        interest in H & L and would benefit economically from Marcucci's loan to H & L.  The

        Guaranty further states the lender agreed to make the loan to H & L in consideration of the

        covenants assumed by the guarantor and expressly acknowledges that "Lender would not

        have extended the Loan without the execution and delivery by Guarantor of th[e] Guaranty

        Agreement."

13.     In greater detail, the Laessig Guaranty provides:

        2.1  Guaranty.  The Guarantor irrevocably and unconditionally guarantees to
        Lender, and becomes surety to Lender for, the prompt payment when due,
        whether by acceleration or otherwise, of all of the Obligation.  The obligations
        of Guarantor hereunder are in addition to any obligations Guarantor may have
        to Lender under any other agreement or agreements.  Guarantor's obligation
        with respect to any representation, warranty or other covenant hereunder shall
        also be in addition [to] Guarantor's guaranty obligation set forth above.

        2.2  Continuing Guaranty.  This Guaranty is and shall be construed to be an
        absolute, unlimited, and continuing guaranty of payment and suretyship, and
        shall be deemed the primary obligation of the Guarantor.  All of the obligations
        and the commitments of Lender to Obligors shall be conclusively presumed to
        have been created in reliance hereon.

        2.3  Invalidity, Irregularity, Unenforceability, Etc. No Defense.  No invalidity,

4

irregularity or unenforceability of, lack of prior enforcement of, delay in enforcement of, or failure to preserve or enforce, the Obligation or of any security for the payment of the Obligation or of rights against any other guarantor thereof (although Lender's rights have been lost) shall affect, impair or be a defense to this Guaranty.

2.4 <u>Waivers</u>.  The Guaranty waives notice of acceptance of this Guaranty, presentment, demand for payment, protest, notice of dishonor, notice of nonpayment of any of Obligor's Obligations.
. . .

3.1 <u>Events of Default</u>.  The following shall be deemed "Events of Default" hereunder: (a) The occurrence of any event of default with respect to any one or more of the Loan Documents.  (b) Failure of Guarantor or any other guarantor to pay any amount when due hereunder to Lender or failure by Guarantor to observe or perform any other covenant, condition or provision contained in this Guaranty.

3.2 <u>Remedies</u>.  Upon the occurrence of an Event of Default: (a) Lender, with not less than ten (10) days notice to Guarantor, may make the Obligation, whether or not then due, immediately due and payable under this Guaranty as to the Guarantor, and Lender shall be entitled to enforce the Obligation against the Guarantor. (b) Lender may exercise any of its rights and remedies provided by the laws of the Commonwealth of Pennsylvania or any other jurisdiction.

3.3 <u>Application of Funds</u>.  Any amounts recovered by Lender hereunder may be applied by Lender to any amount or amounts owing hereunder, in such order as Lender may determine.

Laessig Guaranty, at 2-4.

14.   The Guaranty provides, if the Guarantor fails to perform the covenants contained in the Guaranty, the Lender has the remedy to demand payment and enforce the obligation against the Guarantor, and "no delay by Lender in exercising. . .  any of its rights shall constitute a waiver of [those rights]." Laessig Guaranty, at 4.

15.   The Guaranty further states, "<u>Legal Effect</u>.  This Guaranty shall be binding upon the Guarantor, their heirs and assigns; provided however the Guarantor shall not assign its rights

5

or delegate its duties under this Guaranty, by operation of law or otherwise, and any such attempted assignment or delegation shall be void."  Laessig Guaranty § 3(a).

16.  Ronald and Patricia Laessig both signed this document and the word "(SEAL)" appears next to each of their signatures.

17.  The second promissory note ($600,000 Note) was issued from H & L Developers (Borrower) on January 1, 1991, and made payable to "the order of P. John Marcucci, Jr., Paula Schwartz, Richard Marcucci, Trustees under Deed of Trust dated September 23, 1988."  $600,000 Note, at 1.  Note Two states: "FOR VALUE RECEIVED,"  H & L promised to repay $600,000, plus 11 percent yearly interest.

18.  The third promissory note ($200,000 Note) states "FOR VALUE RECEIVED," H & L promises to repay $200,000 to payee Richard Marcucci, with 9 percent yearly interest.  $200,000 Note, at 1.  Laessig testified that it was Catherine Marcucci, and not her son Richard, who lent H & L the $200,000 referenced in this Note.  He said Richard Marcucci is listed as the payee for estate planning purposes, though the debt was owed to Catherine Marcucci.

19.  The fourth promissory note ($400,000 Note) also states "FOR VALUE RECEIVED,"  H & L would repay $400,000 to payee Catherine Marcucci, plus 11 percent yearly interest.  The $400,000 Note reads : "FOR VALUE RECEIVED, H & L Developers, Inc. (Borrower) promises to pay to the order of Catherine Marcucci (the "Payee") . . . the principal amount of $400,000 . . . with the entire unpaid principal balance hereof being due on December 31, 1995." $400,000 Note, at 1.

20.  All three notes contain the following provision:

6

>The principal amount of this Note may be redeemed at any time in whole or in part; provided that any such redemption shall be in integral multiples of $1,000 and provided further that any such redemption shall be accompanied by payment of any accrued interest with respect thereto.  The Borrower shall maintain a record of any such redemption and all other payments of principal in accordance with the provisions of this Note, setting forth the date and amount thereof, and such record shall be conclusive proof of the principal amount due hereunder in the absence of manifest error.

Notes, at 1.

21.   All three Notes define events of default and provide, in the event of default, the Notes:

>shall become immediately due and payable in full, without presentment, demand, protest or notice, all of which are hereby waived by the Borrower.  In the case of any Event of Default, the Borrower will reimburse the holder of this Note for its reasonable costs and expenses, including attorney's fees, incurred in connection with the enforcement of its rights under the Note.

Notes, § 1(b).

22.   All three Notes contain a provision entitled "Parties in Interest," which provides:

>All covenants, agreements and undertakings in this Note by and on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not.

Notes § 2.1.

23.   The three Notes also includes waivers which read:

>The Borrower hereby waives presentment for payment, demand, protest and notice of protest for nonpayment of this Note, and consents to any extension or postponement of time of payment or (sic) any other indulgence.

 Notes § 2.3.

24.   Beginning in 1990, Marcucci received regular interest payments on her loan to H & L.  First

H & L and then Ronald Laessig sent Marcucci regular checks for interest on the loan.

Neither party's records reflect when Marcucci stopped receiving checks from H & L and

7

began receiving checks from Laessig instead.

25.     As evidence she received interest payments on the Notes and Guaranty, Marcucci submitted

copies of checks she received from Laessig from July 1, 2005, to May 31, 2007.[3]  During this

period of time, Laessig sent 48 checks to Marcucci.  All of these checks were drawn from

a personal bank account which Laessig shared with his daughter, Patricia A. Ferry.  On a few

occasions, when the checks were late, Marcucci called Laessig to tell him she hadn't received

her check.  After she complained on these occasions, Laessig apologized the money was late

and sent a check.  In conversation, Marcucci and Laessig referred to the checks he sent her

as her interest payments.  Laessig disputes the checks he sent to Marcucci were intended as

interest payments.  He testified these payments were intended as gifts to Marcucci because

he cared for her and wanted her to be financially secure, not because of any obligation on his

part.

26.     The checks Laessig sent Marcucci were written for the amount of either $2,000 or $4,000.

Most months Laessig wrote one check for $2,000 and one for $4,000; he often wrote both

checks on the same day.  From July to December of 2005, Laessig paid Marcucci $40,000.

He paid her $68,000 in 2006 and $38,000 from January to May of 2007.  The subject line is

blank on the majority of the checks, however, on 20 checks, the name of a month is listed in

the subject line.  For example, on Check #273, issued on September 27, 2005, for $2,000,

the subject line reads, "Oct 05," and on Check #372, issued on May 1, 2007, for $4,000, the

---

[3] Marcucci was unable to provide any other checks because her bank did not retain copies of her
checks prior to July 2005.

subject line reads, "May."[4]  On April 5, 2007, Laessig issued a check for $2,000 with the subject line "To replace Ch. #306."

27.     The consistent amount of these payments, approximately $6,000 per month, support Marcucci's testimony Laessig was paying interest on the debt he owed her and not gifting money out of his generosity.  Additionally, the subject lines of 20 of the checks list the name of months; these notations suggest Laessig had a monthly obligation to make payments to Marcucci and he sporadically tracked his monthly payments in the subject line of his checks. Laessig's April 5, 2007 check lends further support to the existence of his obligation to pay Marcucci, as the subject line of this check, "To replace Ch.# 306," demonstrates a duty to reimburse unredeemed debt payments.

28.     I find Laessig's testimony that his payments were intended as gifts is not credible.[5]  Laessig's

---

[4] The remaining checks containing a month listed in the subject line are check numbers 274, 275, 276, 277, 278, 283, 284, 287, 288, 298, 299, 300, 301, 303, 304, 305, 306, 371.

[5] Laessig's trial testimony illustrates his evasiveness about the nature of the payments his payments to Marcucci:

> PC: Can you tell us, what were the circumstances surrounding the issuance of these checks?
> RL:  I wanted to keep Catherine going with her needs for income.
> PC: And why did you feel an obligation to do that?
> RL:  Because she's a wonderful person.
> PC:  Now, were these checks gifts to her?
> RL:  No.
> PC:  Were they payment for employment?
> RL:  No.
> PC:  Were they interest payments?
> RL:  No.
> PC:  What are these payments then if they're not interest, they're not gifts, and they're not employment?

RL:  Well, define the word "gifts," what do you mean by "gifts?"  I'm giving her income.  I'm giving her income.

PC:  And why are you giving her income?

RL:  Because I love her.

PC:  Did you give her income because there were $1.2 million that had been lent to you?

RL:  No.

PC:  So it is just pure good will on your part?

RL:  That's correct.

PC:  Without any relationship to the three promissory notes?

RL:  That's correct.

PC:  Based on that explanation, wouldn't that meet the Internal Revenue's definition of a gift?

RL:  I'm not familiar with that section of the code to make that determination.

PC:  But you are a financial planner, correct?

RL:  Yes.

PC:  And you do estate planning for clients?

RL:  Yes I do.

PC:  And isn't part of estate planning, planning gifts?

RL:  Yes.

PC:  To take money out of one's estate?

RL:  Yes.

PC:  So it's fair to say that you do have some knowledge of the term "gift" in the financial planning field?

RL:  Yes.

PC:  And in the financial planning field, you also have to be aware of the Internal Revenue Service, correct?

RL:  I am.

PC:  Did you file gift tax returns for these years?

RL:  No, I did not.

PC:  Why not?

RL:  I didn't consider them gifts.

PC:  Sitting here today, do you consider them gifts?

RL:  If I knew the definition of gifts was from the Internal Revenue I would say yes, but I'm not sure of that because I don't know what the term gift means.

testimony that these regular monthly payments were gifts is further undermined by Laessig's failure to file gift tax returns for these payments in the years he purportedly gifted up to $68,000 to Marcucci.   From 1997-2001, if Laessig made a gift to Marcucci of $10,000 or more, he was required to file a gift tax return with the IRS.  26 U.S.C. § 2503.  If he made a gift of $11,000 or more from 2002-2005, or a gift of $12,000 or more after 2005, he was also required to file a gift tax return with the IRS.  *Id.*   In the years Laessig made payments to Marcucci, he did not file such gift tax returns.  Laessig testified he did not file this return because, despite his occupation as a financial and estate planner, he was uncertain as to the definition of "gift" for IRS purposes.  I am not persuaded by Laessig's testimony.  I find Laessig did not file gift tax returns for the money he paid Marcucci because his payments were not intended as gifts, but were intended as interest payments on the $1,200,000 debt to Marcucci.

29.    To show income interest she received from 1991 to 2005, Marcucci submitted copies of her tax returns from 1990-2007, in which she reported interest income from H & L, Laessig Investment, and Ronald Laessig.  Her tax returns for 2002-2008 are Certified Copies supplied by the Internal Revenue Service.[6]

30.    As further evidence of interest income she received, Marcucci has submitted copies of her tax returns which were retained by her tax preparer.  I find these tax returns are admissible as Marcucci has firsthand knowledge of the information contained within the returns and the

Laessig Testimony.

---

[6] The IRS has no record of receiving a 1040 form from Marcucci for 1990 and did not retain Marcucci's tax returns for 1991 through 2000.

returns provide the court with an accurate statement of the interest income Marcucci received

from 1991 until 2000.  Additionally, the tax returns meet the requirements of Federal Rule

of Evidence 901, as they were properly authenticated by Marcucci's testimony.[7]

31.    Marcucci's tax returns indicate she received between $20,000 and $88,000 a year in interest

income from either H & L or Laessig between 1991 and 2007, although the amount of

interest she was owed each year was $128,000.

32.     Laessig was unable to produce copies of the checks he wrote Marcucci, records of

withdrawals from his bank account, or any other relevant evidence because he testified all

of these  records were destroyed in a flood.

33.    Laessig estimates H & L went out of business in 1999, but he could not estimate the last date

the company issued checks in the company name.

34.    By the plain terms of the $600,000 note, the $200,000 note and the $400,000 note, H & L

defaulted on the notes when it stopped paying the money when it was due, or when it went

out of business, whichever was sooner. Notes, §1 [8]

35.    By the plain terms of the Guaranty contract, the1 Guaranty is "an absolute, unlimited, and

---

[7] "A duplicate is admissible to the same extent as the original unless (1) a genuine question is
raised as to the authenticity of the original or (2) in the circumstances, it would be unfair to admit
the duplicate in lieu of the original."  Fed. R. Evid. 1003.  Under these circumstances, no genuine
question has been raised as to the authenticity of the tax return copies retained by Marcucci's tax
preparer.  Additionally, admission of these returns is not unfair to defendants.  To the contrary,
evidence of defendants' interest payments during these years will serve to offset the Laessig's
total financial liability to Marcucci because the tax returns reveal the amount of interest debt that
has already been paid.

[8] The promissory notes provide an "Event of Default" occurs "[i[f the Borrower shall fail to pay
when due any sum payable to Payee hereunder," "shall default in the performance of any other
agreement or covenant" or "[i]f the Borrower shall become insolvent, bankrupt or shall generally
fail to pay its debts as such debts become due."

continuing guaranty of payment and suretyship" which is "deemed the primary obligation of the Guarantor." Laessig Guaranty, at 2-3. Under the Guaranty, either default on the promissory notes or failure by the Guarantor to pay any amount qualifies as an "Event of Default." Because Laessig stopped paying interest to Marcucci in June of 2007, he and Patricia Laessig defaulted on the Guaranty.

**DISCUSSION**

The Laessigs and Marcucci agree that Catherine Marcucci lent H & L $1.2 million, which Ronald and Patricia Laessig personally guaranteed. The Laessigs have asserted an array of defenses to avoid complying with their personal Guaranty. They assert: (1) Marcucci's claim is invalid because it is barred by the statute of limitations, (2) the promissory notes Ronald Laessig issued to Marcucci are invalid because there was no "meeting of the minds" and the notes are not supported by consideration, (3) the Laessig Guaranty is invalid because it is not supported by consideration, and (4) payment to Marcucci on Notes 2 and 3 and the Guaranty is improper as she is not the listed payee. The Laessigs also argues the $915, 289.98 in attorneys' fees requested by Marcucci is unreasonable.

This Court has jurisdiction over this matter under the diversity statute, and thus this Court must apply state substantive law. *See Mazur v. Merck & Co., Inc.*, 964 F.2d 1348, 1353 (3d Cir. 1992). The parties agree the promissory notes and guaranty in this case are governed by Pennsylvania law.

The Laessigs first argue Marcucci's claim is barred by the statute of limitations for actions to enforce promissory notes and personal guarantees. Pennsylvania sets a twenty-year statute of limitations for instruments under seal. *See* 42 Pa. C.S. § 5529(b)(1) ("Notwithstanding section

13

2255(7) (relating to four-year limitation), an action upon an instrument in writing under seal must be commenced within 20 years."). An "instrument containing the word 'seal' or its equivalent is deemed a sealed instrument if the maker adopts the seal." *Christopher v. First Mutual Corp.*, 2006 U.S. Dist. LEXIS 2255, at *16 (E.D. Pa. Jan. 20, 2006) (citing *Klein v. Reid*, 422 A.2d 1143, 1144 (Pa. Super. Ct. 1980)). Whether or not an instrument is sealed is a question of law. *Swaney v. Georges Twp. Rd. Dist.*, 164 A. 336, 337-38 (Pa. 1932). "[W]hen a party signs a contract which contains a pre-printed word 'SEAL,' that party has presumptively signed a contract under seal." *Beneficial Consumer Discount v. Dailey*, 644 A.2d 789, 790 (Pa. Super. Ct. 1994). This presumption can be rebutted. *Fed. Deposit Ins. Corp. v. Barness*, 484 F. Supp. 1134, 1148 (E.D. Pa. 1980) ("The presence of the printed word "(Seal)" opposite defendant's signature on the promissory note gives rise only to a rebuttable presumption that defendant adopted the seal, thereby rendering the note a sealed instrument."). The Laessig Guaranty contains the word "SEAL" immediately to the right of both Ronald and Patricia Laessig's signature. The Laessigs have not presented any evidence to rebut the presumption that the contract was under seal. Thus, the Laessig Guaranty is a sealed instrument which is subject to the twenty-year statute of limitations period established in § 5529.

Even if this instrument was not created under seal, Marcucci's action still falls within the four-year statute of limitations for actions "upon a negotiable or nonnegotiable bond, note or other similar instrument in writing." 42 Pa. C.S. § 5525(7). This four-year statute of limitations applies to promissory notes, *see Gordon v. Sanatoga Inn, Inc.*, 632 A.2d 1352 (Pa. Super. Ct. 1993) (holding four-year statute of limitations in 42 Pa. C.S. § 5525(7) applies to action to enforce a promissory note), and personal guaranties, *see Citicorp North America, Inc. v. Thornton*, 707 A.2d 536 (Pa. Super. Ct. 1998) (applying § 5525(7) to a personal guaranty), which are not under seal. The guaranty

14

in this case was issued in 1990 and the promissory notes were issued in 1991; Marcucci's case was not filed until November 26, 2008.

However, the four-year limitation period begins after the later of either demand or any payment of principal or interest on a negotiable instrument.  § 5525(7);  *Nimick v. Shuty*, 655 A.2d 132, 135 (Pa. Super. Ct. 1995).  Under Pennsylvania law, the statute of limitations restarts with each payment on an outstanding loan.  *See United States v. Hemmons*, 774 F. Supp. 346, 351 (E.D. Pa. 1991) (citing *Philadelphia v. Holmes Elec. Protective Co. of Phila.*, 6 A.2d 884 (Pa. 1939)).  Partial payment toward the original debt stops the statute from running "because it is an acknowledgment of the debt as an existing obligation, from which the law necessarily implies a promise to pay."  *Thornton*, 707 A.2d at 538 (quoting *Barnes v. Pickett Hardware Co., Ltd.*, 53 A. 378, 379 (Pa. 1902)).  In order for partial payment to toll the statute of limitations, the payment must constitute "a constructive acknowledgment of the debt from which a promise to pay the balance may be inferred."  *Cole v. Lawrence*, 701 A.2d 987, 990 (Pa. Super. Ct. 1997).  In this instance, Marcucci received payments on her loan first from H & L and then from Laessig.  Neither party presented evidence of when the payer changed from H & L to Laessig, and Laessig was unclear as to when H & L stopped holding assets, stopped doing business, and eventually dissolved.[9]  I was, however, presented with

---

[9] The relevant portion of Ronald Laessig's testimony is:

> PC: Is H & L Developers still in business?
> RL: No.
> PC: When did H & L go out of business?
> RL: Ten years ago, approximately, I'm not sure.
> PC: Ok well this is 2009.  When did the development in Florida go under?
> RL: Twelve, thirteen years ago, ten years ago, I'm not a hundred percent sure.
> PC: It wasn't in 1993?  1994?
> RL: No, no, we still had the corporation.  We may not have had assets but we still had the corporation.

evidence that interest payments were made to Marcucci up until May 31, 2007.  If H & L was out of business in 1999, then I infer Laessig made these payments himself from 2000 until 2007.  "There can be no more clear and unequivocal acknowledgment of debt than actual payment." *Huntingdon Fin. Corp. v. Newtown Artesian Water Co.*, 659 A.2d 1052, 1054 (Pa. Super. Ct. 1995).  I find the Laessigs constructively acknowledged their ongoing debt to Marcucci through transmission of regular interest payments to her.

Generally, partial payment on a debt will only restart the statute of limitations as it applies to the original debtor or obligor, not the surety or guarantor.  *Thornton*, 707 A.2d at 538 (citing *Fed. Deposit Ins. Corp. v. Assoc. Nursing Sys., Inc.*, 948 F.2d 233, 237 (6th Cir. 1991)).  However, H & L's payments on the loan can toll the four-year statute of limitations as to the Laessig Guaranty through agreement by the parties, *Thornton*, 707 A.2d at 538; s*ee also Lezzer Cash & Carry, Inc. v. Aetna Ins. Co.*, 537 A.2d 857, 861 (Pa. Super. Ct. 1988) ("[A]s a general rule, a surety is obligated only to the extent provided in the agreement of suretyship.").  Pennsylvania courts look to the language of the surety agreement to determine whether the guarantor's obligation to pay continues after interest is paid on the principle debt.  *Thornton*, 707 A.2d at 536.  I will look to the language

------

PC: Ok, at this point I'm concerned with actively doing business, when did the corporation last actively do business?
RL: I do not recall the exact time.
PC: But roughly, 1993?  1994?
RL: It could have been 1999.
PC: Do you know the last time that H & L Developers issued a check to anyone?
RL: H & L?
PC: H & L Developers.
RL: Not right at the moment, I don't.

Laessig Testimony.

of the Laessig Guaranty to ascertain whether the parties intended the guaranty to be a continuing undertaking in which the Laessigs were primarily liable for H & L's debt.[10]

In *Thornton*, the following language was construed to create a continuing guaranty, with the guarantor primarily liable on the principal's debt: "It being understood and agreed that the liability of the undersigned hereunder shall be primary, direct, and in all respects unconditional." 707 A.2d at 539. The court held language characterizing the guarantor's liabilities as "unconditional" and "continuing" evinced an "unbridled commitment" to guarantee the principal's obligation. *Id.* The Laessig Guaranty states, "[t]his Guaranty is and shall be construed to be an *absolute*, *unlimited*, and *continuing* guaranty of payment and suretyship, and shall be deemed the *primary obligation* of the Guarantor." Laessig Guaranty § 2.2 (emphasis added). I find this strong language shows the parties' intent to make Ronald and Patricia Laessig primarily liable to Marcucci, so that payment on the debt by the principal, H & L, tolled the statute of limitations for both the promissory notes and the Laessig Guaranty. While it is uncertain when H & L stopped paying interest to Marcucci, Marcucci has provided evidence that payments on the $1.2 million debt were made on a yearly basis. I find each of Laessig's payments to Marcucci restarted the statute of limitations. The last of these payments was made on May 31, 2007, and the four year statute of limitations began to run on that date. This case, filed in 2008, is thus within the applicable statute of limitations.

The Laessigs next argue the promissory notes are invalid because not they are not supported

---

[10] The *Thornton* court noted "guaranty" and "surety" are frequently used interchangeably, though the distinction between these roles is significant. "A guarantor undertakes that another person will pay a debt or perform a duty and such person remains primarily liable" while "a surety undertakes to pay the debt . . . if the debtor fails to do so. In case of default the guarantor is secondarily liable while the surety is equally liable with the principal." *Thornton*, 707 A.2d at 539 n.2 (citing *Homewood Peoples Bank v. Hastings*, 106 A. 308, 309 (Pa. 1919)).

17

by valid consideration and there was no meeting of the minds in their creation.  The issue of adequacy of consideration for the promissory notes is resolved by Pennsylvania's Uniform Written Obligations Act (UWOA), 33 Pa. S. § 6.  The statute provides:  "A written release or promise, hereafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound."  *Id.*  Under the UWOA, "an agreement may not be avoided for lack of consideration if [it] contains a provision expressing the parties' intent to be legally bound."  *Laudig v. Laudig*, 624 A.2d 651, 654 (Pa. Super. Ct. 1993).  The purpose of this act was to make the law "substantially the same as it was when seals were in force . . . except that in lieu of the formality of a seal, the formality of this statement is substituted."  *Barness*, 484 F. Supp. at 1148 (citations omitted).

In *QVC, Inc. v. Starad, Inc.*, 2005 U.S. Dist. LEXIS 5473, at *12 (E.D. Pa. March 31, 2005), the court applied Pennsylvania law and found an agreement which included language that the parties "intend to be legally bound hereby" was valid consideration.  *See also Kronz v. Cech (In re Romano)*, 175 B.R. 585, 593 (Bankr. W.D. Pa.1994) (finding the language, "[t]he covenants, conditions and agreements contained in this Mortgage shall bind, and the benefits thereof shall inure to the respective parties hereto and their respective heirs, executors, administrators, successors and assigns as the case may be," satisfied the requirements of the UWOA.)  The second, third, and fourth promissory notes all contained the following language:

> Parties in Interest All covenants, agreements and undertakings in this Note by and on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not.

Notes § 2.1.  This language mirrors the language cited in *QVC* and *Kronz* and expresses an

18

acknowledgment of an intent to be bound by H & L.  Thus, valid consideration exists, as cited in the Promissory Notes.

The Laessigs also argue the promissory notes are not enforceable because there was no "meeting of the minds" in their creation.  For a valid contract to exist, there must be mutuality of assent, or a "meeting of the minds" between parties to a contract.  *See Rusiski v. Pribonic*, 474 A.2d 624, 627 (Pa. Super. Ct. 1984) *rev'd on other grounds*, 515 A.2d 507 (Pa. 1986).  Mutual mistake is a valid ground for rescinding an agreement "where both parties to a contract are mistaken as to existing facts at the time of execution."  *Holt v. Dep't of Public Welfare*, 678 A.2d 421, 423 (Pa. Commw. Ct. 1996).  The doctrine of mutual mistake "applies only where the mistake: (I) relates to the basis of the bargain; (ii) materially affects the parties' performance; and (iii) is not one as to which the injured party bears the risk."  *Consol. Rail Corp. v. Portlight, Inc.*, 188 F.3d 93, 96 (3d Cir. 1999) (citing *Lanci v. Metro. Ins. Co.*, 564 A.2d 972, 974 (Pa. Super Ct. 1989)).

The Laessigs argue there was no negotiation or meeting of the minds regarding the specific terms of the promissory notes, including the applicable interest rates assessed and events which constituted default on the loan.  Both events of default and interest rate relate to the basis of a bargain and could materially affect H & L's obligations under the promissory note contract.  If a true mutual mistake had been made in this case regarding these terms, the Laessigs could satisfy the first two elements of the doctrine of mutual mistake.  Initially, I am unconvinced a mistake was actually made in this case, as Laessig testified he directed his attorney to prepare the promissory notes and informed his attorney which interest rate was appropriate for each note, what date principal payment was due, and what the events of default should be.  I do not assume these terms were chosen carelessly.  *See Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982) (stating a court interpreting a Pennsylvania

19

contract "do[es] not assume that its language was chosen carelessly" or "that the parties were ignorant of the meaning of the language employed"). Furthermore, the Laessig's mutual mistake defense fails on the third prong of the doctrine because, as the party who directed the Notes' creation, Ronald Laessig bore the risk of any drafting mistake. When an asserted mistake is unilateral rather than mutual, is due to the negligence of the mistaken party, and is not due to the fault of the non-mistaken party, Pennsylvania law will not permit relief to be granted to the mistaken party. *See Warren v. Greenfield*, 595 A.2d 1308, 1312 (Pa. Super. Ct. 1991); *Cobaugh v. Klick-Lewis, Inc.*, 561 A.2d 1248, 1251 (Pa. Super. Ct. 1989). Regardless of whether the disputed terms were mistakenly included, Laessig directed the creation of the promissory notes and could have reviewed the notes before he transmitted them to Marcucci. He bore the risk of the terms he selected and cannot now assert a defense of mutual mistake.

The Laessigs similarly argue the Laessig Guaranty is unenforceable because it is not supported by sufficient consideration. "It is well established that only those contracts of guaranty which are founded upon some consideration are enforceable." *Paul Revere Protective Life Ins. Co. v. Weis*, 535 F. Supp. 379, 385 (E.D. Pa. 1981) (citing *Harr v. Perkins*, 6 A.2d 534 (Pa. 1939)). To have an enforceable guaranty contract, however, it is not necessary that consideration pass directly to the guarantor. *Weis*, 535 F. Supp. at 385. An extension of credit to the principal debtor is sufficient consideration to enforce the guarantor's promise. *Id.* (citing *Florida Asphalt Pavement Mfg. Co. v. Fed. Reserve Bank*, 76 F.2d 326, 327-28 (5th Cir. 1935)). Here, the Guaranty specifically provides that Ronald Laessig is a fifty percent shareholder in the obligor and will benefit economically from the extension of the loan to the obligor. This is sufficient consideration because of the stated benefit Laessig received through the loan from Marcucci to H & L.

20

Additionally, under the UWOA, "a written release or promise, hereafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound." 33 Pa. S. § 6.  Under Pennsylvania law, "parties have the right to make their own contract, and it is not the function of a court to rewrite it or to give it a construction in conflict with the accepted and plain meaning of the language used." *Meeting House Lane, Ltd. v. Melso*, 628 A.2d 854, 857 (Pa. Super. Ct. 1993).  The Laessig Guaranty states: "<u>Legal Effect.</u> (a) This Guaranty shall be binding upon the Guarantor, their heirs and assigns."  I find the parties clearly and unambiguously intended the instrument to be an unconditional promise of repayment.  The Guaranty formally expresses the Laessigs' intent to be legally bound; thus, this Guaranty is enforceable against them.  *See Fasco v. Modernage, Inc.*, 311 F. Supp. 161, 164 (W.D. Pa. 1970).

Finally, the Laessigs assert they should not be required to repay the loan amount, including interest, owed to Marcucci because the Laessig Guaranty is not made out to Catherine Marcucci but is made out to her children, "P. John Marcucci, Jr., Paula Schwartz and Richard Marcucci" as "Trustees under Deed of Trust of P. John Marcucci dated September 22, 1988." Laessig Guaranty, at 1.  Similarly, the $600,000 promissory note is made out to the same "deed of trust" and the $200,000 promissory note is made out to Richard Marcucci.  However, Laessig testified none of Marcucci's children ever loaned H & L or Richard and Patricia Laessig any money.  Additionally, neither Marcucci nor any of her children were aware of a deed of trust and Marcucci's children had no expectation of receiving money from the Laessigs under the Laessig Guaranty.  Laessig testified a deed of trust was created by another attorney, but did not provide this Court with such a document or any evidence the document was created or that a Deed of Trust exists.  Because Marcucci and her

21

children have no knowledge of a purported deed of trust and Laessig presented no evidence it actually exists, I am faced with an ambiguity in the terms of the Laessig Guaranty, the $600,000 Note, and $200,000 Note regarding who is the appropriate payee.

To resolve an ambiguity in a written contract, I must ascertain the intent of the parties. A contract is to be enforced so as to give effect to the reasonable expectations created by the parties in entering into the bargain. *Johnson v. Fenestra, Inc.*, 305 F.2d 179, 181 (3d Cir. 1962) (applying Pennsylvania law). A question of intent may be resolved by parol evidence. *Castellucci v. Columbia Gas of Pa., Inc.*, 310 A.2d 331 ( Pa. Super. Ct. 1973). The parol evidence rule does not bar admission of extrinsic evidence when it is necessary to show that a mistake has been made and the written terms of a contract do not reflect the intended agreement of the parties. *West Conshohocken Rest. Assocs., Inc. v. Flanigan*, 737 A.2d 1245, 1248 (Pa. Super. Ct. 1999). "[W]here an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances." *Katzeff v. Fazio*, 628 A.2d 425, 428 (Pa. Super. Ct. 1993). Laessig testified he asked his attorney to create the Guaranty, and the purpose of the Guaranty was to protect Catherine Marcucci, not her children, because Catherine Marcucci relied on Laessig to protect her financial stability and manage her financial affairs. Marcucci's children had not seen the Promissory Notes or the Guaranty before the instant litigation. Laessig further testified the purported trust he referenced in the Guaranty was prepared for Marcucci's benefit, and such alleged trust was created for Marcucci's benefit. I find parol evidence in this case resolves the ambiguity of the intended payee on the Guaranty.

Furthermore, under Pennsylvania law, the intent of the issuer of an instrument controls when there is a conflict between the intended payee and the payee identified on an instrument. 13 Pa. C.S.

22

§ 3110.[11] Laessig's testimony clearly shows the Guaranty was created to benefit Catherine Marcucci and Laessig intended the benefits of the Guaranty to inure to her.   Accordingly, I find that Laessig's intent in issuing the $600,000 Note, the $200,000 Note, and the Laessig Guaranty was to provide payment to Catherine Marcucci.

The Laessigs finally dispute Marcucci's request for judgment against defendants of $915,298.89 in attorneys' fees.  Plaintiff suggests these fees are provided for in the promissory notes and guaranty.  I require more information about the fees counsel accumulated while working on this case so a reasonable fee amount, if any, can be determined.  Defendants must also receive fair notice of the basis for the fees claimed, as well as an opportunity to respond to a petition for attorneys' fees.

To determine damages owed to Marcucci under the Laessig Guaranty, it is necessary to assess both the interest which has accrued on the $1,200,000 loan, and the interest paid to date on the loan. Under the terms of the Laessig Guaranty, Ronald and Patricia Laessig have promised repayment of $1.2 million in principal in the event H & L did not repay Marcucci's loan.  This initial amount does not include the interest which has accrued over the last 19 years.  In Pennsylvania, interest on an interest-bearing instrument is calculated from the date of the instrument.  13 Pa. C.S. § 3112(a)(2). "The method of calculation of prejudgment interest is generally simple interest, as opposed to

---

[11] Under the heading, "Identification of person to whom instrument is payable," the statute provides, in relevant part:

   (a) INTENT OF ISSUER.-- The person to whom an instrument is initially payable is determined by the intent of the person, whether or not authorized, signing as, or in the name or behalf of, the issuer of the instrument. The instrument is payable to the person intended by the signer even if that person is identified in the instrument by a name or other identification that is not that of the intended person.

13 Pa. C.S. § 3110(a).

compound interest." *Option One Mortg. Corp.*, 2009 U.S. Dist. LEXIS 96342, at *23 (citing *Spang & Co. v. USX Corp.*, 599 A.2d 978, 984 (Pa. Super. 1991)).   In the instant case, Marcucci has requested simple interest on the loan.   Simple interest is calculated by multiplying the principal by the interest rate to calculate the amount of yearly interest.   That amount is then multiplied by the number of years that have passed since the date of the instrument.   The instant Guaranty promises repayment of $1.2 million which is divided into three promissory notes which have two different applicable interest rates.   The interest Ronald and Patricia Laessig owe, to date, is calculated below.

| Promissory Note | Date of Note | Loan Amount | Interest Rate | Yearly Interest Owed | Interest Owed to-Date (1/1/2010) |
|---|---|---|---|---|---|
| 2 | Jan. 1, 1991 | $600,000 | 11% | $66,000 | $1,254,000.00 |
| 3 | Jan. 1, 1991 | $200,000 | 9% | $18,000 | $342,000.00 |
| 4 | Jan. 1, 1991 | $400,000 | 11% | $44,000 | $836,000.00 |
| Total | | $1,200,000 | | $128,000 | $2,432,000.00 |

Thus, the Laessigs owe Marcucci $1,200,000 in principal and $2,432,000 in interest.[12]   This amount, however, is offset by the interest payments made by H & L and Laessig.   Marcucci's tax returns from 1991 to 2007 reveal that, between 1991 and 2007, $903,521.00 in interest payments were

---

[12] Marcucci also requested compensatory damages for unpaid interest on the January 6, 1989 Promissory Note.  I find this interest payment is not appropriate for two reasons.  First, it appears Marcucci forfeited unpaid interest on that note when the principal was rolled over into the three subsequent promissory notes and a different interest rate was applied.  Second, the first promissory note is not covered by the Laessig Guaranty.  The first promissory note memorializes a loan between the Laessigs and Catherine Marcucci, while the Guaranty promises repayment on a loan to H & L Developers.  I find the terms of the Guaranty only apply to the second, third, and fourth promissory notes.

made on the promissory notes and the Laessig Guaranty.[13]   This calculation differs from the

_____

[13]

| Year | Relevant Interest Income Reported | Source of Interest Income |
|------|------|------|
| 1991 | $40,333.00 | H & L Developers Group |
|      | $60,500.00 | H & L Developers Group |
|      | $545.00 | Laessig Investment |
|      | $94.00 | Laessig Investment |
| 1992 | $23,333.00 | H & L Developers Inc. |
|      | $37,250.00 | H & L Developers Inc. |
|      | $2,453.00 | Laessig Investment Co. |
|      | $5,333.00 | Ronald Laessig (Individual) |
| 1993 | $88,000.00 | H & L Developers Inc. |
|      | $4,680.00 | Laessig Investment Co. |
| 1994 | $64,000.00 | H & L Developers Inc. |
| 1995 | $48,000.00 | H & L Developers Inc. |
| 1996 | $44,000.00 | H & L Developers Inc. |
| 1997 | $44,000.00 | H & L Developers Inc. |
| 1998 | $44,000.00 | H & L Developers Inc. |
| 1999 | $45,000.00 | H & L Developers Inc. |
| 2000 | $44,000.00 | H & L Developers Inc. |
| 2001 | $60,000.00 | H & L Developers Inc. |
| 2002 | $60,000.00 | H & L Developers Inc. |
| 2003 | $24,000.00 | H & L Developers Inc. |
| 2004 | $48,000.00 | H & L Developers Inc. |
| 2005 | $48,000.00 | H & L Developers Inc. |

calculation submitted by Marcucci's expert for two reasons.  First, it appears Marcucci's expert inadvertently included interest payments for 1992 twice, and mistakenly credited the Laessigs and H & L with an additional $65,916 in interest payments.  Second, Marcucci's expert did not include interest income Marcucci received from Laessig Investment, Laessig Investment Co., or Ronald Laessig in calculating interest paid under the promissory notes and Guaranty.  However, as there is no evidence of any other debt between Laessig and Marcucci, I believe this was an omission on the part of Marcucci's witness, and these interest amounts should be included in the calculation and offset against the Laessigs' debt.

For the years 2005, 2006, and 2007, there is a discrepancy between the amount paid to Marcucci in checks from Laessig and the amount Marcucci claimed as interest income on her tax return.  In 2005, Marcucci reported $48,000 in interest income, but the checks from Laessig amount to only $40,000 in interest income. I find the most likely explanation for this discrepancy is that the bank's failure to supply checks from January through May of 2005, so the amount paid during those months is unaccounted for in the checks, but reflected in Marcucci's tax return.  In 2006, the checks reveal Marcucci received $68,000 from Laessig, but she reported only $48,000 in interest income; in 2007, the checks reveal Marcucci received $36,000 from Laessig, but she reported only $20,000 in interest income.  I find the explanation offered by Marcucci's expert is credible and that in 2006

| 2006 | $48,000.00 | H & L Developers Inc. |
|---|---|---|
| 2007 | $20,000.00 | H & L Developers Inc. |
| **Total Interest Paid** | **$903,521.00** | |

26

and 2007 the additional funds were not reported on Marcucci's tax return because she applied the additional funds to the principal of the loan and did not report return of principal on her tax return. Under the terms of the Laessig Guaranty, Marcucci was free to judge whether payments would be applied to interest or principal.[14]   While I heard no direct testimony that Marcucci applied the difference to the principal amount owed, I find it is equitable to resolve the discrepancy in this way as it is favorable to the Laessigs since it ultimately reduces the amount they owe Marcucci under the Laessig Guaranty. Thus, the principal amount the Laessigs owe Marcucci is adjusted based on this application of funds to the principal.  The principal due is reduced by $20,000 for payments in 2006 and by $16,000 for payments in 2007.  The total principal due is $1,164,000.

The decreased principal due alters the total interest due.  Without the decrease in principal, the Laessigs owed $2,432,000.  After 2006, the Laessigs debt was decreased to $1,180,000. Because there are two applicable interest rates on this loan, I must determine how interest should be calculated on the reduced principal. One million dollars of the principal was subject to an eleven percent yearly interest rate while the remaining $200,000 loan was subject to a nine percent interest rate.  I will again resolve this discrepancy in favor of the Laessigs and conclude Marcucci applied this principal to the $1,000,000 portion of the loan. Accordingly, the Laessigs owe Marcucci $125,800 in interest for

---

[14] The relevant portion of the Guaranty reads:

> 3.3 Application of Funds.  Any amounts recovered by Lender hereunder may be applied by Lender to any amount or amounts owing hereunder, in such order as Lender may determine.

Laessig Guaranty, at 4.

2007.[15]    The principal debt was again reduced in 2007 so that the Laessigs owe Marcucci $124,040

for 2008 and 2009.[16]    Thus, in total the Laessigs owe Marcucci $2,421,880 in interest.

**CONCLUSION**

       For the reasons set forth above, judgment in this case is entered for the Plaintiffs, Catherine

Marcucci et al., and against Defendants Ronald and Patricia Laessig and Defendant H & L

Developers, Inc.  An appropriate order of judgment will follow.

---

[15] Calculated as ($980,000 principal x .11 interest percentage) + ($200,000 principal x .09 interest percentage).

[16] Calculated as ($964,000 principal x .11 interest percentage) + ($200,000 principal x .09 interest percentage).